## CHEEK *v*. THE STATE.

CRIMINAL LAW.—*Admission of Evidence.*—On a trial for murder, a statement of the deceased person, made before the commission of the act, and not made in the presence or hearing of the defendant, is not competent evidence against him.

SAME.—*Exclusion of Evidence.*—On a trial for murder, it is error to exclude evidence tending to show that the person killed by the defendant had entered into a combination with a third person to induce the defendant's wife to elope with such third person and leave her husband and children, and that the facts tending to prove such combination, of late date, had come to the knowledge of the defendant.

SAME.—*Misconduct of Jury.*—During the progress of a trial upon a charge of murder, two of the jurors, over the objection of the defendant, took, in writing, notes of the evidence, and persisted therein, although directed by the court not to do so.

*Held,* that this was such misconduct on the part of the jury as entitled the defendant to a new trial.

APPEAL from the Franklin Circuit Court.

PETTIT, J.—The appellant was indicted for murder in the first degree, for killing one Thomas Harrison, in the Dearborn Circuit Court; and, on his application, the venue was changed to the Franklin Circuit Court. Trial by jury on a plea of not guilty; verdict of guilty of murder in the first degree; motions for a new trial and in arrest of judgment were overruled; and judgment of death was rendered on the verdict.

1.   It is claimed that the court had no jurisdiction in the case, and erred in refusing to arrest the judgment.

2.   That the court erred in giving, and refusing to give, instructions asked.

3.   That the court erred in admitting illegal evidence, and rejecting legal evidence.

We will first consider the admission of evidence against the appellant, alleged and thought to be illegal, and improperly admitted.

After Dr. Kyle had been examined for the State, and Baily (indicted with the defendant for the murder of Harrison) for the defense, Kyle was recalled by the State, and was asked this question: "At the time you and Harrison started up the hill, and on your way up the hill to the point where the

meeting with Cheek and Baily occurred, what was the expressed purpose of Harrison for turning back with you?"

Objected to, and not allowed to be answered till the following questions were put by the defendant and answered by the witness:

1. "Please state whether, at the time this conversation took place, the defendant and Baily, or either of them, was in sight or hearing of yourself and Mr. Harrison, or either of you." Answer: "They were not in sight, and they could not hear an ordinary conversation."

2. "What is your best judgment, considering the distance between yourself and Mr. Harrison, on the one part, and the defendant and Baily, on the other part, as to whether the defendant and Baily, or either of them, heard the beginning of the conversation between you and Mr. Harrison, when you met Mr. Harrison, or any of it?" Answer. "My impression is, they did not hear it; we spoke in ordinary conversation."

After this, the witness was allowed to answer the original question, which he did thus: "Mr. Harrison spoke thus: 'Doc, I am glad you have come; there are two ruffians going up the road, and they have threatened to take my life; they have gone to my house, and I want you to go back with me.'"

The evidence, here and elsewhere in the record, shows that neither the defendant nor Baily did hear or could have heard this statement, and that the parties were not in sight or hearing of each other, when speaking in the usual tone of voice. In fact, it is made clear that this statement was not heard by or known to either Cheek or Baily. This evidence was not rebutting to any question asked by the defendant, nor to any testimony given on his behalf. Was it *res gestæ?* We think not. Bouvier says, "When it is necessary, in the course of a cause, to inquire into the nature of a particular act, or the intention of the person who did the act, proof of what the person said at the time of doing it is admissible evidence as a part of the *res gestæ*, for the purpose of showing its true character."

We think the books may be searched without success, to find a case where the statements of a murdered man, made before he came in sight or hearing of his slayer, can be given in evidence against the accused on his trial.

Was this evidence detrimental to the accused ? We think so. It was well calculated to make or induce the jury to believe that the killing was from premeditated malice, and not from sudden, hasty transport, or momentary passion; and might, and probably did, induce the jury to find a verdict of murder in the first degree (the penalty for which is death), instead of a lower degree of the offense.

The case must be reversed for this error, and it is hardly necessary to notice the other questions; but we will refer to one or two other points raised.

Were the instructions rightly given and refused ?

We have carefully examined, and are satisfied with them. Indeed, they are quite as favorable to the defendant as he had a right to ask. Nor did the court commit any error in refusing to give instructions asked by the appellant.

There was some evidence given, and much more offered, but rejected by the court, tending to prove that the deceased, who was the father of the defendant's wife, was and had been in an unnatural combination with one Clem, to induce the defendant's wife to leave him and elope with Clem. This evidence, so far as the acts, sayings, and doings of Harrison, of a late date, had been communicated, or come to the knowledge of the defendant, should have been admitted. This evidence would have tended to show the state of Cheek's mind, and a reason for his being so highly frenzied upon his meeting the deceased, as testified to by Dr. Kyle; and it would have tended to show that the deceased might have used the abusive words, and made the threats to Cheek, testified to by Baily, and thereby tended to mitigate the rigor of the verdict.

Two of the jurors, over the objection of the defendant, and after the court had told them they must not do so, persisted in writing down notes of the evidence. This disobe-

dience of the order of the court was a gross violation of, and contempt for, the authority of the court, and was misconduct for which the jurors might have been severely punished, and of itself would entitle the defendant to a new trial.    It was well calculated to divert the attention of the jurors, while they were busy, pencil or pen in hand, from the evidence, as it would naturally be progressing while such notes were being made.    The juror is to register the evidence, as it is given, on the tablets of his memory, and not otherwise. Then the faculty of the memory is made, so far as the jury is concerned, the sole depository of all the evidence that may be given; unless a different course be consented to by the parties, or the court.   Burrill Cir. Ev. (2d ed.) 108, and note (a).    The jury should not be allowed to take the evidence with them to their room, except in their memory.    It can make no difference whether the notes are written by a juror or by some one else.   Jurors would be too apt to rely on what might be imperfectly written, and thus make the case turn on a part only of the facts.

At the proper time, there was a motion made in arrest of judgment; and under this motion it is insisted that the Franklin Circuit Court had no jurisdiction of the cause, because the transcript of the Dearborn Circuit Court does not show that a grand jury was empanelled at the term at which the indictment was found, otherwise than as the same appears in the indictment itself; and because the transcript does not show who delivered the transcript and original papers from the Dearborn Circuit Court to the clerk of the Franklin Circuit Court.   We have not come to a conclusion on this question; nor do we deem it of importance that we should, as the case must be reversed, and the defects, if any there are, can be cured before another trial.

The judgment is reversed, with instructions to the court below to give the appellant a new trial.

*J. Schwartz*, for appellant.

*B. W. Hanna*, Attorney General, and *M. M. Ray*, for the State.